**SIGNED THIS: March 8, 2012**

_____
**Mary P. Gorman
United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | |
| WILDWOOD INDUSTRIES, INC., | ) | Case No. 09-70602 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| ALEX D. MOGLIA, | ) | |
| Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 09-7094 |
| | ) | |
| FLANDERS CORPORATION, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## O P I N I O N

For many years, Wildwood Industries, Inc. ("Wildwood") conducted an apparently successful manufacturing business in Bloomington, Illinois. On March 5, 2009, several of Wildwood's creditors filed an involuntary Chapter 11 petition against Wildwood. An order for relief was entered on March 27, 2009. Alex D. Moglia was appointed as the Chapter 11 Trustee on April 9, 2009. Not long after his appointment, the Trustee discovered that Wildwood, through its principals, had engaged in a massive fraud against many of its creditors by inducing creditors to finance Wildwood's supposed acquisition of equipment and machinery which, it turned out, never existed, and by refinancing loans for other equipment which, unbeknownst to creditors, had already been pledged to other lenders.

On May 27, 2009, this Court entered an order ("Sale Order") authorizing the Trustee to sell most of Wildwood's assets to Flanders Corporation ("Flanders"). The Sale Order provided that the assets were to be sold free and clear of all liens, claims, and interests, and that any such liens, claims, or interests would attach to the proceeds from the sale. The Sale Order also provided for a $250,000 "carve out" from the sale proceeds for the benefit of the bankruptcy estate to pay priority claims, and a $250,000 "true lease" escrow fund to be used to resolve claims of holders of "true leases" in the assets sold. The Sale Order excluded from the assets sold "all equipment subject to operating leases, also known as 'true leases' (as opposed to disguised financing agreements), as determined by the Bankruptcy Court pursuant to the Uniform Commercial Code and applicable bankruptcy law."

Because of confusion about what assets actually existed at Wildwood, the Trustee commissioned the MEI Corporation ("MEI") to perform an inventory and appraisal of the equipment at Wildwood. In conducting the analysis, which it completed on August 6, 2009, and formally titled Detailed Forced Liquidation Value Appraisal and Cross Reference of Secured Party Master Lease of Wildwood Industries, Inc. ("MEI Report"), MEI assigned each piece of machinery an MEI Reference Number.

This case was converted to Chapter 7 on September 18, 2009, and Mr. Moglia was again

appointed Trustee. He filed this adversary complaint on November 2, 2009, to determine the validity, priority, and extent of liens on the proceeds from the sale of assets to Flanders and to determine whether any claims would be made on the $250,000 in the true lease escrow fund. An amended complaint was filed on September 21, 2010. One hundred twenty-seven defendants were named in the amended complaint and were identified as having some potential claim to the sale proceeds or the true lease escrow funds. All defendants have been served and have either answered the amended complaint or been defaulted.

Flanders has filed its Third Joint Motion for Partial Summary Judgment ("Third Joint Motion") with RPS Products, Inc. ("RPS"). Flanders sold some of the assets it purchased from the Trustee to RPS. Flanders' intent to immediately sell some of the Wildwood assets to RPS was disclosed when the Trustee initially sought authority to make the sale to Flanders because RPS had also been a bidder on the assets and the Trustee wanted to avoid future allegations of manipulation of the sale price by competing bidders. Although it is unclear from the amended complaint what recognizable interest RPS has in this litigation, presumably due to an abundance of caution, the Trustee named RPS as a defendant in this adversary proceeding.

In their Third Joint Motion, Flanders and RPS seek an order declaring that none of the other defendants in this adversary proceeding have an interest in the assets designated in the MEI Report as MEI Reference Nos. 32, 33, 34, 35, 36, 45, 102, 113, and 114. Only People's Capital and Leasing Corporation ("People's") responded to the Third Joint Motion. In its Response in Opposition to Third Joint Motion for Partial Summary Judgment ("Response"), People's objects only as to the equipment assigned MEI Reference Nos. 32, 33, 34, 35, and 45 ("the equipment"). People's claims that a genuine issue of material fact exists because the MEI Report may be inaccurate or insufficiently detailed and notes that the MEI Report concluded that this equipment may belong to People's.

The Third Joint Motion has been fully briefed and is ready for decision.

## JURISDICTION

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334. The issues decided herein are core proceedings. *See* 28 U.S.C. § 157(b)(2)(A), (K).

## UNDISPUTED MATERIAL FACTS

As noted above, only People's responded to the Third Joint Motion. Accordingly, the relief requested as to defendants other than People's will be granted with only limited further analysis. And, because People's does not dispute the claims of Flanders and RPS with respect to the assets with MEI Reference Nos. 36, 102, 113, and 114, the relief requested as to those items will also be granted in large measure. Based on the Third Joint Motion, People's Response, and the Reply Brief in Support of Third Joint Motion ("Reply Brief") of Flanders and RPS, the following are the undisputed material facts related to the remaining dispute over the assets designated MEI Reference Nos. 32, 33, 34, 35, and 45.

1. On or around January 12, 2006, Wildwood entered into Master Lease Agreement No. 1356 ("Master Lease Agreement 1356") and accompanying Schedule No. 001, Schedule A, and Revised Schedule A ("1356 Schedule 001, Schedule A, and Revised Schedule A") with People's wherein Wildwood leased from People's a piece of equipment described in Schedule A as:

**Vendor: W.S. Hudson Converting Machinery**

| QUANTITY | DESCRIPTION | SERIAL NUMBER |
|---|---|---|
| 1 | Inline Double Fold Finishing System with Laminating Capability | 2005-0245 |

In Revised Schedule A, the equipment is described in more detail with the following:

**Vendor: W.S. Hudson Converting Machinery.**

**One (1) W.S. Hudson Inline Double Fold Finishing System with Laminating Capability, <u>Serial no. 2005-0245</u>:**

    **A. Single Wall Laminated Vacuum Paper Dust Container Manufacturing Unit, Dual Unwind Stand Constructed as follows:**

        (a) Double unwind shaft bearings
        (b) Mechanical braking system
        (c) Independent manual paper roll side adjustment
        (d) 50" roll diameter maximum

    **B. One Color Printing Press constructed as follows:**

        (a) 5/8" carbon steel plate frame
        (b) 2" carbon steel plate printing unit frames
        (c) Stainless steel ink pan
        (d) Rubber covered ink rolls to accommodate 60" web width
        (e) Air lift off for plate roll
        (f) 110 tooth change gear maximum repeat

    **C. 110 Paper Forming and Perfo Cut off Section Size to Match Sample Furnished 110 Teeth Maximum Repeat.**

    **D. Single Stage Inline Folding System as follows:**

        (a) 1" carbon steel frame
        (b) 4 stage cam assembly
        (c) Slide-by intermediate gears for ease of bottom width adjustment
        (d) Single stage closing mechanisms
        (e) Spring loaded, self adjusting bottom post bars (maximum width 16½")

    **E. Inline Pressure Section as follows:**

        (a) 5/8" carbon steel plate frame
        (b) Pressure adjustable pick-up roll

    **F. Single Drum Carrier Style Pressing System With Cross Delivery Table and (25) Bag Counter for Manual Bulk Packaging.**

    **G. Electric Eye Monitoring of Product Flow Throughout the Machine for Immediate Shut Off in the Case of Paper Storage.**

    **H. Drive to be 10hp, 3 phase, SCR**

2. People's filed UCC Financing Statement No. 10578485 on January 20, 2006.

3. The collateral description in People's UCC Financing Statement No. 10578485 is:

    All property set forth in Schedule No. 001 dated January 12, 2006 to Master Lease Agreement No. 1356 dated January 12, 2006 between Debtor and Secured Party as described on the attached Schedule A.

    Secured Party believes that any collateral location(s) specified on Schedule A are correct but the effectiveness of this Financing Statement shall apply regardless of the Collateral location(s).

4. The "attached Schedule A" referenced in the collateral description in UCC Financing Statement No. 10578485 is the same document as the Schedule A mentioned in paragraph one above.

5. On or about February 14, 2006, Wildwood and People's executed Schedule No. 002 and Schedule A to Master Lease Agreement 1356 ("1356 Schedule 002 and Schedule A"), which provides that Wildwood was to lease from People's a piece of equipment described in 1356 Schedule 002 and Schedule A, as:

**Vendor: W.S. Hudson Converting Machinery**

| QUANTITY | DESCRIPTION | SERIAL NUMBER |
|----------|-------------|---------------|
| 1 | Universal Per-Fo Cut Off and Die Section System. Per-Fo Cut Off Including: [A.] Double Rotary Upper and Lower Male and Female Per-Fo Rollers. [B.] Channel Mounted 5/8" Plate Side Bearing Frames to accommodate up to 15" Upper Roll Diameter Repeat. | 2005-0249 |
| | Die Section Including: [A.] Self Standing Steel Frame [B.] Bearing Slide Frame to Allow up to 15" Diameter Repeat. [C.] All necessary Entrance and Exit Turn Rollers to allow for Paper Flow. [D.] All components for Installation and Drive Assemblies. | |

6. On February 16, 2006, People's filed UCC Financing Statement No. 10663032, which covers:

All property set forth in Schedule No. 002 dated February 14, 2006 to Master Lease Agreement No. 1356 dated January 12, 2006 between Debtor and Secured Party as described on the attached Schedule A.

Secured party believes that any Collateral location(s) specified on Schedule A are correct but the effectiveness of this Financing Statement shall apply

regardless of the Collateral location(s).

The "attached Schedule A" is the same document and contains the same equipment description as the Schedule A referenced in paragraph five above.

7. On March 17, 2006, People's filed UCC Financing Statement No. 8805314, which is an amendment to UCC Financing Statement No. 10578485. The financing statement describes the added collateral as:

> Amend to add equipment and restate the collateral and equipment locations covered by this Financing Statement as listed on the attached Revised Schedule A.

> Secured party believes that any Collateral location(s) specified on Schedule A are correct but the effectiveness of this Financing Statement shall apply regardless of the Collateral location(s).

The "attached Revised Schedule A" is the same document and contains the same equipment description as the Revised Schedule A referenced in paragraph one above.

8. The MEI Report became effective on August 1, 2009.

9. Schedule 1 in the MEI Report lists each asset according to an "MEI Reference Number" and an Asset Tag Number. Schedule 1 also identifies each asset by manufacturer, description, and, where possible, by serial number. Also, Schedule 1 gives a forced liquidation value for each MEI Reference Number.

10. Schedule 2 in the MEI Report is the Wildwood Industries Master Lease Schedule by Secured Party. Schedule 2 lists each potentially secured party and attempts to determine whether each entity's claims or UCC Financing Statement identifies one or more of the assets which MEI inventoried and listed in Schedule 1.

11. According to Schedule 2, MEI found that the collateral descriptions in one or more UCC Financing Statements filed by the following parties might describe the machinery identified as MEI Reference Nos. 32, 33, 34, 35, and 45: ACC Capital Corporation; Associated Bank, NA; CIT

–7–

Technology Financing Services, Inc.; Diversified Financial Services, Inc.; GCI Capital, Inc.; Home Federal Savings Bank; North Star Leasing Company; First Sound Bank d/b/a/ Puget Sound Leasing; Rapid Capital, Inc.; SCG Capital Corporation; The National Bank; and Valley Commercial Capital, LLC. Each of these parties has been dismissed previously pursuant to an Order of Default or a Stipulated Judgment.

12. Also in Schedule 2, MEI found that collateral descriptions in UCC Financing Statements filed by certain non-parties to this adversary case might describe the equipment designated as MEI Reference Nos. 32, 33, 34, 35, and 45. These non-parties are: Allegiant Partners, Inc.; Banc One Leasing Corporation; and Washington Mutual Bank.

13. Schedule 2 of the MEI Report says that collateral descriptions in UCC financing statements by certain party defendants (other than People's) in this adversary case might describe the machinery designated as MEI Reference Nos. 32, 33, 34, 35, and 45. However, none of these party defendants responded to the Third Joint Motion. Said party defendants are: Amcore Bank; Bridgewater Bank; Citizens Equity First Credit Union, a/k/a CEFCU; Fifth Third Bank; First Midwest Bank; First Premier Capital, LLC; Goodfield State Bank; Heritage Bank of Central Illinois; Main Street Bank, d/b/a Studebaker-Worthington Leasing; and Suntrust Equipment Finance and Leasing Corporation.

14. Schedule 2 of the MEI Report states MEI's belief that the collateral description in People's UCC Financing Statement No. 10578485 may describe the machinery identified as MEI Reference Nos. 32, 33, 34, 35, and 45.

15. The equipment designated MEI Reference No. 32 is described in the MEI Report as follows:

> ASSET TAG #101 WEBER MODEL 11 AR PAPER LAWN WASTE BAG
> MANUFACTURING LINE (1953) INCLUDING BUT NOT LIMITED TO:
> (2) WEBER 60" DEAD SHAFT UNWIND STANDS WITH POWER
> UNDER ROLLS, DANCER, PINCH ROLLS AND OVERHEAD HOIST

SYSTEM. (1) PAPER CONVERTING 80" TWO COLOR FLEXO-GRAPHIC PRINT STAND SERIAL NO. 6111 WITH POWER TENSION ROLLS. (1) MANUFACTURER UNKNOWN 60" TOP AND BOTTOM SHEET GLUER STAND WITH HOT AND COLD GLUE SYSTEM AND PINCH ROLLS. (1) MANUFACTURER UNKNOWN BAG MAKING MACHINE WITH PLOW FOLDER AND GLUER STAND, TAB SLITTER, NOTCHING DIE PRESS, ROLL PRESS, ROTARY CUTOFF, BAG SEPARATORS, ROTARY DIE CUTTER, BOTTOM FOLDER AND GLUER, DRUM PRESS AND DELIVERY, SHAFT DRIVEN SYSTEM AND MISCELLANEOUS SUPPORT EQUIPMENT. (1) MANUFACTURER UNKNOWN PNEUMATIC RUNOUT STACKER TABLE. (1) JOIN PACK MODEL ES-102A PORTABLE TABLE TYPE STRAPPER SERIAL NO. 106051166 (2006). (1) BELCOR MODEL 150 TOP AND BOTTOM CASE SEALER.

The quantity is listed as "LOT."

16. The equipment designated MEI Reference No. 33 is described in the MEI Report as follows:

ASSET TAG #102 WEBER MODEL 11AR PAPER LAWN WASTE BAG MANUFACTURING LINE (1961) INCLUDING BUT NOT LIMITED TO: (2) WEBER 60" DEAD SHAFT UNWIND STANDS WITH POWER UNDER ROLLS, DANCER, PINCH ROLLS AND OVERHEAD HOIST SYSTEM. (1) MANUFACTURER UNKNOWN 60" 4 COLOR FLEXO-GRAPHIC PRINT STAND SERIAL NO. N/A WITH POWER TENSION ROLLS. (1) WEBER 60" TOP AND BOTTOM SHEET GLUER STAND WITH HOT AND COLD GLUE SYSTEM AND PINCH ROLLS. (1) WEBER MODEL 11AR BAG MAKING MACHINE SERIAL NO. 349 WITH PLOW FOLDER AND GLUER STAND, TAB SLITTER, NOTCHING DIE PRESS, ROLL PRESS, ROTARY CUTOFF, BAG SEPARATORS, ROTARY DIE CUTTER, BOTTOM FOLDER AND GLUER, DRUM PRESS AND DELIVERY, SHAFT DRIVEN SYSTEM AND MISCELLANEOUS SUPPORT EQUIPMENT. (1) MANUFACTURER UNKNOWN PNEUMATIC RUNOUT STACKER TABLE. (2) JOIN PACK MODEL ES-102A PORTABLE TABLE TYPE STRAPPERS SERIAL NOS. 108011088 AND 108071237 (2008).

The quantity given is "LOT."

17. The equipment designated MEI Reference No. 34 is described in the MEI Report as follows:

ASSET TAG #103 WEBER MODEL 1050 PAPER LAWN WASTE BAG MANUFACTURING LINE (1978) INCLUDING BUT NOT LIMITED TO: (2) WEBER 60" DEAD SHAFT UNWIND STANDS WITH POWER UNDER ROLLS, DANCER, PINCH ROLLS AND OVERHEAD HOIST SYSTEM. (1) WEBER 80" 4 COLOR FLEXO-GRAPHIC PRINT STAND SERIAL NO. N/A WITH POWER TENSION ROLLS. (1) WEBER 60" TOP AND BOTTOM SHEET GLUER STAND WITH HOT AND COLD GLUE SYSTEM AND PINCH ROLLS. (1) WEBER MODEL 10/50 BAG MAKING MACHINE SERIAL NO. 753 WITH PLOW FOLDER AND GLUER STAND, TAB SLITTER, NOTCHING DIE PRESS, ROLL PRESS, ROTARY CUTOFF, BAG SEPARATORS, ROTARY DIE CUTTER, BOTTOM FOLDER AND GLUER, DRUM PRESS AND DELIVERY, SHAFT DRIVEN SYSTEM AND MISCELLANEOUS SUPPORT EQUIPMENT. (1) MANUFACTURER UNKNOWN PNEUMATIC RUNOUT STACKER TABLE. (1) JOIN PACK MODEL ES-102A PORTABLE TABLE TYPER STRAPPER SERIAL NO. 108071239 (2008). (1) BELCOR MODEL 252 TOP AND BOTTOM CASE SEALER SERIAL NO. 021035. (1) BELCOR MODEL 505 CASE ERECTOR SERIAL NO. 010980.

The quantity is "LOT."

18. The equipment designated MEI Reference No. 35 is described as follows:

ASSET TAG #104 WEBER MODEL 11AR PAPER LAWN WASTE BAG MANUFACTURING LINE (1961) INCLUDING BUT NOT LIMITED TO: (2) WEBER MODEL RST 60" DEAD SHAFT UNWIND STANDS WITH POWER UNDER ROLLS, DANCER, PINCH ROLLS AND OVERHEAD HOIST SYSTEM. (1) MANUFACTURER UNKNOWN 60" 2 COLOR FLEXO-GRAPHIC PRINT STAND WITH POWER TENSION ROLLS. (1) MAQUISAC ZARA 4 COLOR FLEXO-GRAPHIC PRINT STAND SERIAL NO. N/A WITH POWER TENSION ROLLS. (1) MANUFACTURER UNKNOWN BAG MAKING MACHINE WITH PLOW FOLDER AND GLUER STAND, TAB SLITTER, NOTCHING DIE PRESS, ROLL PRESS, ROTARY CUTOFF, BAG SEPARATORS, ROTARY DIE CUTTER, BOTTOM FOLDER AND GLUER, DRUM PRESS AND DELIVERY, SHAFT DRIVEN SYSTEM AND MISCELLANEOUS SUPPORT EQUIPMENT. (1) MANUFACTURER UNKNOWN PNEUMATIC RUNOUT STACKER TABLE. (1) JOIN PACK MODEL ES-102A PORTABLE TABLE TYPE STRAPPER SERIAL NO. 108011074 (2008). (1) BELCOR MODEL 150 TOP AND BOTTOM CASE SEALER SERIAL NO. 00767. (#2008-0163).

The quantity listed is "LOT."

18. The equipment designated MEI Reference No. 45 is described as follows:

> ASSET TAG #120 WEBER PAPER LAWN WASTE BAG
> MANUFACTURING LINE INCLUDING BUT NOT LIMITED TO: (2)
> WEBER 60" DEAD SHAFT UNWIND STAND WITH POWER UNDER
> ROLLS, DANCER, PINCH ROLLS AND OVERHEAD HOIST. (1) PAPER
> CONVERTING 80" 2 COLOR FLEXO-GRAPHIC PRINT STAND SERIAL
> NO. 6110 WITH POWER TENSION ROLLS. (1) WEBER 60" TOP AND
> BOTTOM SHEET GLUER STAND WITH HOT AND COLD GLUE
> SYSTEMS AND PINCH ROLLS. (1) WEBER MODEL 11AR TYPE SOS
> BAG MAKING MACHINE SERIAL NO. 439 WITH PLOW FOLDER AND
> GLUER STAND, TAB SLITTER, NOTCHING DIE PRESS, ROLL PRESS,
> ROTARY CUTOFF, BAG SEPARATORS, ROTARY DIE CUTTER,
> BOTTOM FOLDER AND GLUER, DRUM PRESS, DELIVERY SHAFT
> DRIVEN SYSTEM AND MISCELLANEOUS SUPPORT EQUIPMENT,
> (1) MANUFACTURER UNKNOWN PNEUMATIC RUNOUT STACKER
> TABLE. CYBERTECH ADHESIVE SYSTEM.

The quantity is listed as "LOT."

## LEGAL ANALYSIS

### I. Standing

Before reaching the merits of the Third Joint Motion, preliminary matters need to be addressed. The issues are whether RPS actually has standing to bring the Third Joint Motion and whether either Flanders or RPS has standing to seek all of the relief prayed for in the Third Joint Motion. Although no party has raised these issues, the Court must consider them in order to fully decide the Third Joint Motion.

The Trustee named RPS as a defendant in this case and, in both his original and amended complaint, simply plead that Flanders sold a portion of the Wildwood assets to RPS, and RPS is bound by the Sale Order. Neither RPS nor anyone else claims that RPS is a creditor in this case or that it has any interest in either the sale proceeds or the true lease escrow funds. RPS did not purchase assets from this estate and was not a party to any contract with the Trustee. RPS was mentioned in the Trustee's motion seeking authority to sell assets to Flanders and in the Sale Order

only for the purpose of disclosure to avoid the possibility that the sale could be avoided later based on an allegation of collusion among bidders. *See* 11 U.S.C. § 363(n).

The Sale Order excluded assets subject to true leases and placed on Flanders the risk that the true lease fund might be inadequate to pay all true lease claimants. Flanders may well have included similar provisions in its sale documents with RPS, but that subsequent sale to RPS does not give RPS — or any other subsequent purchaser — standing to seek relief from this Court. The rights and obligations RPS has with respect to Flanders arise from a transaction which occurred outside the jurisdiction, control, and protection of this Court. RPS bought assets knowing Flanders' title to the assets was subject to potential claims of true leaseholders. Whatever terms RPS and Flanders agreed to in their sale documents to address the title issues is between them, and any disputes that might arise between them will not be resolved here.

Standing is a required element for a case or controversy to exist for the exercise of federal jurisdiction. *Bond v. Utreras*, 585 F.3d 1061, 1069 (7th Cir. 2009). A party has standing if it is entitled to have the court decide the merits of its dispute. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To the extent RPS wants a determination regarding the nature or priority of its interest in the assets it bought from Flanders, it must look elsewhere. RPS purchased Flanders' assets — not Wildwoods' assets — and RPS is on its own as far as this Court is concerned in resolving what title it has to those assets. RPS does not have standing to seek relief from this Court based on its post-petition purchase of assets from Flanders.

The Court's concerns about standing should not be news to RPS. On February 23, 2011, RPS filed its own Motion for Partial Summary Judgment in this proceeding. At a subsequent hearing, this Court questioned whether RPS had standing to seek relief from this Court and suggested that Flanders was the real party in interest with respect to the issues RPS sought to resolve. Subsequently, RPS abandoned its Motion for Summary Judgment and, on March 28, 2011, filed a Joint Motion for

Partial Summary Judgment with Flanders. A Second Joint Motion for Partial Summary Judgment was filed on June 23, 2011. Each motion pertained to specifically identified assets sold to Flanders by the Trustee and sought to foreclose the interests of all other defendants in those assets. In the absence of objection, this Court entered orders granting both motions.

The amended complaint filed by the Trustee here seeks to determine if any defendants are the holders of true leases and, therefore, are entitled to a portion of the true lease escrow fund. Flanders has an interest in that issue because, if the true lease fund is exhausted, Flanders will have to satisfy additional claimants. RPS has no recognizable interest in the issue here because whatever exposure it has on the issue arises from a transaction which occurred outside of the Wildwood case and outside of this Court's jurisdiction. Neither Flanders nor RPS has standing to litigate with respect to the other relief the Trustee requests, which is to determine the various defendants' interests in the sale proceeds.

Nevertheless, in their Third Joint Motion, Flanders and RPS request this Court to find that no other defendant has any interest in any of the assets referred to in the Motion. This request for relief is confusing and imprecise. Creditors with secured interests in the assets which were sold had their liens transferred to the sale proceeds by the Sale Order. Accordingly, no further relief in favor of Flanders or RPS is available against them. At most, what Flanders is entitled to is a determination as to whether any creditor has a true lease interest in any of the transferred assets. That relief can be awarded here.

As set forth above, this Court entered orders on the two prior Joint Motions for Partial Summary Judgment and, unfortunately, entered orders which stated that no defendant other than RPS had an interest in the assets described in each motion. In hindsight, the relief granted was overly broad, imprecise, and awarded to a party without standing. Accordingly, to the extent relief is warranted here, it will be more precisely crafted. Because this Court did not previously force

-13-

resolution of the standing issue, and because the same result is reached regardless of whether RPS

participates in the case, this Court will continue to refer to RPS along with Flanders and will decide

the Third Joint Motion as it is presented. But, if any further motions of any type are filed by RPS in

this proceeding or in the main Wildwood case, RPS should expect to fully brief and resolve the

standing issue before the substantive merits of any such motion will be reached.


## II. Summary Judgment

Federal Rule of Civil Procedure 56(a), as made applicable to adversary proceedings in

bankruptcy by Federal Rule of Bankruptcy Procedure 7056, says, in pertinent part, "The court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P.

7056. A judge's function in evaluating a motion for summary judgment is not to weigh the evidence,

but merely is to determine whether there is a genuine issue of material fact for trial. *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242 , 249 (1986). If, from the materials presented to the court, a

reasonable trier of fact could find in favor of the nonmoving party, then the motion should be denied.

The movant bears the burden of establishing that no genuine issue of material fact exists. *Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). To carry this burden, the

movant must inform the court of the basis for the motion and identify the "portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986). The court must draw all reasonable inferences from the

underlying facts in favor of the nonmoving party. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d

1027, 1032 (7th Cir. 1998). Once the movant meets its burden, then the opposing party must offer

specific facts to show that the factual dispute is genuine. *Anderson*, 477 U.S. at 250. The nonmoving

party must show more than some "metaphysical doubt" about the material facts, and speculation, bare conclusions, and flat denials are insufficient to create a genuine factual issue. *Matsushita*, 475 U.S. at 586; *Roger Whitmore's Auto Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 669 (7th Cir. 2005). Assuming no genuine issue of material fact exists, the movant also must show that the controlling substantive law demands a result in its favor. *See ANR Advance Transp. Co. v. Int'l Bhd. of Teamsters Local 710*, 153 F.3d 774, 777 (7th Cir. 1998).

### III. No Genuine Issue of Material Fact Exists

A. *The portion of People's Response labeled "Response to undisputed material facts" fails to comply with Local Rule 7.1(D).*

Upon the filing of the Third Joint Motion, this Court entered an order requiring all parties to comply with Local Rule 7.1(D) of the Central District of Illinois, which dictates how parties must handle motions for summary judgment and the responses and replies thereto. CDIL-LR 7.1(D). Regarding responses to motions for summary judgment, the Local Rules say:

> Disputed Material Facts: List by number each fact from Section B of the motion for summary judgment which is conceded to be material but is claimed to be disputed. Each claim of disputed fact must be supported by evidentiary documentation referenced by specific page. Include as exhibits all cited documentary evidence not already submitted by the movant."

CDIL-LR 7.1(D)(2)(b)(2) . The Local Rules provide that, "A failure to respond to any numbered fact will be deemed an admission of the fact." CDIL-LR 7.1(D)(2)(b)(6).

This Court has said on multiple prior occasions that parties must strictly comply with the Local Rules. *Richardson v. MBNA Am. Bank (In re Clayton)*, 369 B.R. 383, 386-88 (Bankr. C.D. Ill. 2007); *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 890 (Bankr. C.D. Ill. 2007). Moreover, the Seventh Circuit has endorsed the strict enforcement of local rules pertaining to summary judgment. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994). Failure to comply

with the Local Rules merits adverse consequences for the offending party. *Richardson*, 369 B.R. at 388.

Unfortunately for People's, its Response fails to comply with the Local Rules. People's concedes the materiality of the facts contained in paragraphs 4-8 of the Third Joint Motion pertaining to descriptions of equipment given MEI Reference Nos. 32, 33, 34, 35, and 45, but disputes them by saying that the MEI Report concluded that People's may have an interest in that same equipment. In raising this dispute, People's fails to cite "evidentiary documentation referenced by specific page," as required by the Local Rules, which leaves the Court in the position of having to scour the record itself in search of the supposed factual dispute. *See Waldridge*, 24 F.3d at 921-22.

More importantly, People's failure to provide citations demonstrating the asserted factual dispute means that People's is deemed to have admitted the facts in paragraphs 4-8 of the Third Joint Motion. CDIL-LR 7.1(D)(2)(b)(6); *see Waldridge*, 24 F.3d at 921-22. In *Waldridge*, the Seventh Circuit was interpreting a local rule from the Southern District of Indiana which is practically identical in content and purpose to Local Rule 7.1 in the Central District of Illinois. Much like the problem with People's Response here, the party opposing the motion for summary judgment in *Waldridge* submitted a memorandum which "did not make any effort to identify with specificity what factual issues were disputed, let alone supply the requisite citations to the evidentiary record." *Id.* at 922. Specifically, the memorandum submitted in *Waldridge* merely contained a list of questions outlining the contested issues. Similarly, in place of specific citations to the record, People's offers only assertions and questions, such as, "Were the authors of the MEI Report vendors of the type of equipment in People's UCC Financing Statements? Are the authors some kind of equipment specialists or experts?" As *Waldridge* makes clear, People's failure to provide or cite to specific evidence works against it.

B. *The portion of People's Response entitled "Response to undisputed material facts" raises no genuine issue of material fact.*

The purpose of summary judgment is to determine whether there is a genuine and material factual issue such that a reasonable trier of fact could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248; *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Even if the Local Rules did not exist or this Court did not strictly enforce them, the portion of the Response entitled "Response to undisputed material facts" still would not successfully raise a genuine issue of material fact.

People's claims to dispute the material facts set forth in paragraphs 4-8 of the Third Joint Motion. The sole "fact" in People's "Response to undisputed material facts" is that the MEI Report concluded People's may have an interest in the same equipment. However, this is not a fact at all, but is rather a conclusion based on an interpretation of undisputed facts, which is no reason for the Court to deny the Third Joint Motion. *See Cable Elec. Prods., Inc. v. Genmark, Inc.*, 582 F. Supp. 93, 97 (N.D. Cal. 1984). In the *Genmark* case, the plaintiff sought to avoid summary judgment in a patent infringement case by presenting an expert who would have opined on the significance of certain facts. The court found that this formed no basis for denying summary judgment because the expert's testimony would only have fostered a dispute regarding the meaning of "undisputed evidentiary facts in the process of determining what are commonly called 'ultimate facts'…and does not require a trial." *Id.* The court went on to say, "Expert declarations, then, do not without more necessarily preclude summary judgment…a trial is unnecessary where the subject matter of the expert declaration is 'readily understandable,' and a trial 'would undoubtedly produce more argument but no more enlightenment.'" *Id.* at 98 (quoting *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984)); *see also Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994) ("Statements of 'beliefs' or 'opinions' are insufficient to create a genuine issue of material fact.") (citing *Powers v. Dole*, 782 F.2d 689, 695 (7th Cir. 1986)). People's quarrel with certain material

facts in the Third Joint Motion is not that it disagrees with those facts, but that it differs as to the

conclusion to be drawn from those facts. This is not a basis for denying the Third Joint Motion.

Finally, in its "Response to undisputed material facts," People's says that the following is an

additional material fact: "The Master Lease Agreement No. 1356 dated January 12, 2006 and

Schedules 001 and 002 thereto are "true leases" (as opposed to disguised financing statements)." In

their Reply Brief, Flanders and RPS correctly object on the basis that this is a legal conclusion rather

than a statement of fact. Whether an entity's interest in a piece of personal property is a true lease

or a security interest may raise both questions of law and fact, but where the determination merely

requires construing an unambiguous written agreement and not considering extrinsic facts, as here,

it is a question of law only. *See Knickerbocker Russell Co. v. Mountain Valley Constr. Co. (In re*

*Mountain Valley Constr. Co., Inc.)*, 3 B.R. 433, 434 (Bankr. W.D. Pa. 1980). But even if the

existence of a true lease is a question of fact, People's bare claim that it holds a true lease is just a

conclusion which deserves no weight, as People's offers no analysis of the relevant statutes and

factors used to distinguish between a true lease and security interest. *See Lujan v. Nat'l Wildlife*

*Fed'n*, 497 U.S. 871, 888 (1990); *Payne*, 337 F.3d at 773. Ultimately, the success or failure of the

Third Joint Motion does not turn on whether People's has a true lease or security interest because

People's Response raises no genuine issue of material fact as to whether the equipment that is the

subject of the Third Joint Motion is the same as the equipment in which People's claims an interest.

C. *The "Argument" section of People's Response raises no genuine issue of material fact.*

To the extent that People's intends to use its "Argument" to demonstrate that a material

factual dispute exists, this approach also is unavailing. In the "Argument" section, People's makes

several assertions about the MEI Report, to wit:

> The authors of the MEI Report have not been deposed or examined under oath, nor
> have the Movants provided any basis for why People's or this Court should take the
> assertions and descriptions made within the MEI Report as accurate or true. Were the

authors of the MEI Report vendors of the type of equipment identified in People's UCC Financing Statements? Are the authors some kind of equipment specialists or experts?

The questions People's asks here are of a kind which should have been pursued through discovery. However, given People's failure to produce and cite to any specific materials that would create a genuine issue of fact as to these questions, this does not suffice to defeat a motion for summary judgment. *See Matsushita*, 475 U.S. at 586; *Waldridge*, 24 F.3d at 922.

> [D]espite the differences between the descriptions within the MEI Report and People's UCC Financing Statements, the MEI Corporation found sufficient similarities between the two descriptions, after a physical inspection, to indicate that the Equipment may be all or part of the Schedule 001 and 002 Equipment owned by People's.

MEI's conclusion that People's may have an interest in the equipment labeled MEI Reference Nos. 32, 33, 34, 35, and 45 is not a fact, but an opinion based on undisputed facts. Thus, that conclusion is irrelevant for purposes of determining whether People's has established a genuine issue of material fact. *See Genmark*, 582 F. Supp. at 97.

> [T]he seemingly inconsistent assertions within the MEI Report (the Equipment descriptions versus the assertion that the Equipment is People's), by itself, raises a genuine issue of material fact regarding whether the Equipment identified on Schedule 2 to the MEI Report is the same, or partially the same, as the Schedule 001 and 002 Equipment leased to Wildwood by People's.

People's raises no issue of fact with respect to the description of the equipment itself, but relies on a conclusion to attempt to show that a factual issue exists. For the reasons already discussed, this is insufficient. *See Genmark*, 582 F. Supp. at 97.

> It is well known that much of the equipment possessed by Wildwood had missing or replaced serial numbers.

Presumably, People's could have used the discovery process during the two-plus years this adversary case has been pending to explore this issue with respect to the specific equipment in which People's now claims it has an interest. In fact, the Sale Order which authorized the sale of

substantially all of Wildwood's assets to Flanders provided that creditors claiming to hold true leases would have continuing access to identify and inspect assets at Wildwood sites.

Given the ample opportunity People's has had to inspect the equipment in which it claims it has an interest, People's generalized conjecture is insufficient to raise a genuine issue of fact with respect to the equipment at issue in the Third Joint Motion. *Nat'l Westminster Bank USA v. Ross*, 676 F. Supp. 48, 51 (S.D.N.Y. 1987); *see Matsushita*, 475 U.S. at 586; *Roger Whitmore's Auto Servs.*, 424 F.3d at 669.

> [V]arious machinery was also combined, so it is impossible to state with accuracy whether the Equipment, in whole or in part, was manufactured by Weber, W.S. Hudson, or any other company.

People's inability to produce any evidence to show that this is an issue with the equipment in dispute here, namely the equipment given MEI Reference Nos. 32, 33, 34, 35, and 45, means that this is pure speculation and does not create a genuine factual issue. *See Nat'l Westminster Bank USA*, 676 F. Supp. at 51.

In considering the sum of what People's presents in its Response, the inescapable conclusion is that People's has failed to raise a genuine issue of material fact. Once Flanders and RPS met their burden of showing the absence of a genuine issue of material fact, People's had to produce its own evidence to show that there was a genuine and material factual issue. *Anderson*, 477 U.S. at 252. However, for all the reasons just discussed, People's Response presents no material and genuine factual issue on the question of whether the equipment described in its leases and UCC Financing Statements with Wildwood is partially or entirely the same as any of the equipment which is identified as MEI Reference Nos. 32, 33, 34, 35, or 45.

This result occurs even if the documents People's has submitted establish that People's holds a true lease in the equipment described in its documents. This is because, as a factual matter, People's has created no genuine issue of material fact as to the question of whether People's

documents and the MEI Report actually are describing the same pieces of equipment. For several

reasons, no reasonable trier of fact could find in People's favor on this factual issue. First, the

equipment is labeled in the MEI Report as a Weber model, whereas People's documents refer to the

equipment described therein as a Hudson model. Second, comparing the serial numbers listed in the

MEI Report and in People's documents shows that none of the serial numbers are the same. Finally,

and more generally, the descriptions contained in the MEI Report and People's documents diverge

so significantly that no reasonable trier of fact could find that they are describing the same

equipment, and People's has offered no other materials to create a dispute on this issue. Thus, no

genuine dispute of material fact exists to preclude the entry of summary judgment in favor of

Flanders and RPS.


### IV. Flanders and RPS are entitled to judgment as a matter of law

The Third Joint Motion, People's Response, and the Reply Brief clearly show that no factual

dispute exists, but Flanders and RPS still must show that the substantive law demands a result in

their favor. *See ANR Advance Transp. Co.*, 153 F.3d at 777. Flanders and RPS have made the

requisite showing.

As Flanders and RPS note in the Third Joint Motion, the Sale Order pursuant to which the

Trustee sold most of Wildwood's assets to Flanders provided for the sale to be free and clear of all

liens, claims, and interests in the assets. Among those assets were the equipment that is the subject

of the Third Joint Motion, which is the equipment given MEI Reference Nos. 32, 33, 34, 35, 36, 45,

102, 113, and 114. Pursuant to the Sale Order, "all equipment subject to operating leases, also known

as 'true leases' (as opposed to disguised financing agreements), as determined by the Bankruptcy

Court pursuant to the Uniform Commercial Code and applicable bankruptcy law," was excluded

from the sale.

-21-

People's is the only party which has responded to the Third Joint Motion and, in its Response, it claimed there is a genuine issue of material fact as to whether MEI Reference Nos. 32, 33, 34, 35, and 45 is the same equipment in which People's says it has a true lease. However, People's failed to raise a genuine issue of material fact as to whether the equipment designated MEI Reference Nos. 32, 33, 34, 35, and 45 is the same equipment as that in which People's says it holds an interest. No other party defendant claims to have a true lease in this equipment. Thus, Flanders and RPS are entitled to a finding that no other Defendant holds a true lease in the equipment.

With respect to the machinery designated MEI Reference Nos. 36, 102, 113, and 114, no party defendant responded to the Third Joint Motion. Hence, Flanders and RPS are entitled to a finding that no other Defendant holds a true lease in MEI Reference Nos. 36, 102, 113, or 114.

## CONCLUSION

For the reasons set forth above, the Third Joint Motion for Partial Summary Judgment will be granted, insofar as the Third Joint Motion requests a finding that no other Defendant has a true lease in the equipment identified as MEI Reference Nos. 32, 33, 34, 35, 36, 45, 102, 113, and 114.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###